No. 22-35731

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

LARRY W. MERRILL,

Plaintiff-Appellant

v.

LANE FIRE AUTHORITY, TERRY NEY,
STOELK INVESTIGATION AND CONSULTATION, LLC,
AN OREGON LIMITED LIABILITY COMPANY, AND D. CRAIG STOELK,

Defendants-Appellees

On Appeal from the United States District Court
For the District of Oregon, Eugene
No. 6:20-cv-00984-MK
Honorable Mustafa Kasubhai

---

**APPELLANT'S OPENING BRIEF**

---

Erin E. Gould
Erin E. Gould, LLC
800 Willamette Street, Suite 530
Eugene, OR 97401
541-485-1088
erin@eringouldlaw.com

Attorney for Appellant
Larry W. Merrill

## DISCLOSURE STATEMENT

Appellant is an individual and is not required to file a Disclosure Statement.

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.    Whether the District Court erred in concluding Mr. Merrill's procedural due process rights were not violated because there were no issues of material fact and granting summary judgment in favor of Defendants on his claims of wrongful termination, deprivation of rights, defamation and negligence? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.    Whether the District Court erred in its related decision concluding Mr. Stoelk was a "representative of the lawyer," as defined in ORS 40.225(1)(f) and finding communications between Mr. Stoelk, Chief Ney, and Ms. Moffat were privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501 and therefore denying discovery? . . . 7

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.    The District Court erred in concluding Mr. Merrill's procedural due process rights were not violated because there were no issues of material fact by granting summary judgment in favor of Defendants on his claims of wrongful termination, deprivation of rights, defamation and negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    II.    The District Court erred in its related decision concluding Mr. Stoelk was a "representative of the lawyer," as defined in ORS 40.225(1)(f) and therefore finding communications between Mr. Stoelk, Chief Ney, and Ms. Moffat were privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501, and subsequently denying discovery . . . . . . . . . . 21

ii

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.    The District Court erred in concluding Mr. Merrill's procedural due process rights were not violated because there were no issues of material fact by granting summary judgment in favor of Defendants on his claims of wrongful termination, deprivation of rights, defamation and negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.    *Mr. Merrill was not provided proper notice of the allegations against him and the reasons for his termination.* . . . . . . . . . . 27

B.    *There is no evidence that Chief Ney prepared "multiple disciplinary options" which he then allegedly brought with him to the pre-disciplinary hearing along with Mr. Merrill's termination letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.    *The investigation into Mr. Merrill was not conducted in a fair or impartial manner* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.    *An issue of material fact exists as to whether Mr. Merrill's defamation claim is time-barred.* . . . . . . . . . . . . . . . . . . . . . . 37

E.    *Chief Ney is not immune from liability for a defamation claim when he has falsely accused Mr. Merrill of criminal acts* . . . 39

II.    The District Court erred in its related decision concluding Mr. Stoelk was a "representative of the lawyer," as defined in ORS 40.225(1)(f) and therefore finding communications between Mr.Stoelk, Chief Ney, and Ms. Moffat were privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501, and subsequently denying discovery. . . . . . . . . . . 40

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

iii

TABLE OF AUTHORITIES

## CASES

*Admiral Ins. Co. v. Untied States District Court for the District of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989)(citing Fed. R. Civ. P. 26(b)(3)) . . . . . . . . . . . . . 41, 42

*Amy's Kitchen, Inc. v. Stukel Mountain Organics LLC*, 2016 WL 9406695 at *2 (United States District Court, D. Oregon, Medford Division 2016) . . . . . . . 43, 44

*Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 921 (9th Cir. 2013) . . . . . 26

*Bradford v. Union Pacific R.R. Co.*, 872 F. Supp. 2d. 912 (2012) . . . . . . . . . . . . 2

*Brewster v. Bd. of Educ. of Lynwood Unified School Dist.*, 149 F. 3d 971 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Brink et ux v. Multnomah County*, 224 Or. 507, 517, 356 P.2d 536 (1960) . . . . . 43

*Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622 (9th Cir. 1998) . . . . . . 25

*Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 973 (9th Cir. 2017) . . . . 23

*Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1009 (9th Cir. 2004) . . . . . . . . 24

*Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9thCir. 1992) . . 25

*Clements v. Airport Auth. Of Washoe Cty.*, 69 F.3d 321, 323 (9th Cir.1995) . . . . 30

*Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) . . . . . . . 2, 26, 28

*Cruz v. Nat'l Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018) . . . 23

*Doubleday v. Ruh*, 149 F.R.D. 601, 605 n.3 (E.D.Cal. 1993) . . . . . . . . . . . . . . . 40

*F.T.C. v. Garvey*, 383 F.3d 891, 896 (9th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . 23

iv

*Facebook, Inc. v. Power Ventures, Inc*., 844 F.3d 1058, 1070 (9th Cir. 2016). . . 24

*Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . 23

*Goldsborough*, 105 Or. App. at 504, citing, *In re Grand Jury Investigation of Ocean Transp*., 604 F.2d 672 (D.C.Cir.), cert. den. 444 U.S. 915, 100 S.Ct. 229, 62L.Ed.2d 169 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F2d 573,577 (9th Cir. 1992)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*IMDb.com Inc. v. Becerra*, 962 F.3d 111, 119 (9th Cir.2020) . . . . . . . . . . . . . . 24

*IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 127 (9th Cir. 2020) . . . . . . . . . . . . . 24

*Kelly v. City of San Jose*, 114 F.R.D. 653, 656 (N.D.Cal. 1987). . . . . . . . . . . . . 40

*Kobold v. Good Samaritan Regional Medical Center*, 832 F.3d 1024,1048 (2016)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Kulas v. Flores*, 255 F.3d 780, 783 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 24

*Laub v. Untied States Dep't of Interior,* 342 F.3d 1080, 1084, 1093 (9th Cir. 2003)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Liggett v. Brown & Williamson Tobacco Corp*., 116 F.R.D.205, 207 (M.D.N.C.1986)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Mathews v. Eldridge*, 424 U.S. 319, 33 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 18, 27

*Miller v. Comm'r*, 310 F.3d 640, 642 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 23

*Minnesota Life Ins. Co. v. Ensley*, 174 F.3d 977, 987 (9th Cir. 1999) . . . . . . . . 23

*O'Leary v. Purcell Co.*, 108 F.R.D. 641, 646(M.D.N.C.1985) . . . . . . . . . . . . . . 46

*Olsen v. Idaho State Bd. of Medicine*, 363F. 3d 916, 922 (9th Cir. 2004) . . . . . . 23

v

*Pavel v. Univ. of Or.*, No. 6:16-cv-00819-AA, 2017 WL 1827706 (D. Or.,Eugene Div. April 3, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Preminger v. Peake*, 552 F.3d 757, 768 n.10 (9th Cir. 2008) . . . . . . . . . . . . . . . 24

*Qualls v. Blue Cross, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) . . . . . . . . . . . . . . . 24

*School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Smith v. Coulombe*, 2013 WL428363 at *3 (United States District Court, D. Oregon, Pendleton Division, 2013)(citing *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021). . . . . . . . . . . . . 23

*State v. Moore*, 45 Or.App. 837, 609 P.2d 866 (1980) . . . . . . . . . . . . . . . . . . . . 46

*Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Thrifty Oil Co. v. Bank of America Nat. Trust*, 322 F.3d 1039, 1046 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546 (D.D.C.1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United Pacific Ins. Co. v. Trachsel*, 83 Or.App. 401, 404 (Ct. App. Or. 1987) . . 43

*United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . 44

*United States v. Gurtner*, 474 F.2d 297, 298 (9th Cir.1973) . . . . . . . . . . . . . . . . 41

*United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) . . . . . . . . . . . . . . . . 41

*United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) . . . . . . . . . . . 40, 42, 43

*Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Weil v. Inv./Indicators, Research & Management, Inc.*, 647F.2d 18, 25 (9th Cir 1981)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## **STATUTES**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 47

ORS 164.015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ORS 164.043 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 30, 39

ORS 166.065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14, 30, 39

ORS 40.225. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22

ORS 40.225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 40, 45

ORS 40.225(1)(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 40

## **RULES**

Fed. R. Civ. P. 26(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Civ. P. 26(b)(3)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Civ. P. 26(b)(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

vii

Federal Rule of Appellate Procedure 4(a)(1)(A) and (B)..................... 6

Federal Rule of Evidence 501 ................................. 1, 7, 21, 40

## OTHER AUTHORITIES

McCormick, Evidence § 93, 194 n 14 (E. Cleary 2d ed1972)................ 46

## CONSITUTIONAL AMENDMENTS

U.S. Const. amend. XIV, § 1 ......................................... 2

INTRODUCTION

This appeal arises out of Mr. Merrill's termination from the Lane County Fire Authority on June 29, 2018. Mr. Merrill brought claims against Lane Fire Authority("LFA"), Terry Ney ("Chief Ney") and Stoelk Investigation and Consultation, LLC, and D. Craig Stoelk ("Mr. Stoelk") on June 18, 2020 in United States District Court for the District of Oregon, Eugene Division. Mr. Merrill's claims include wrongful termination without adequate due process, defamation, negligence, and 42 U.S.C § 1983 deprivation of rights. Although considerable issues of material fact exist as to each of these claims, the District Court granted LFA, Chief Ney, and Mr. Stoelk's Motions for Summary Judgment.

In a related decision, the District Court also denied Mr. Merrill discovery of communications between Mr. Stoelk, LFA, and general counsel for LFA, Diana Moffat ("Ms. Moffat"). The District Court concluded that Mr. Stoelk's communications with Ms. Moffat and Chief Ney are privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501. The District Court denied Mr. Merrill's Motion to Compel those communications containing evidence of Chief Ney and LFA's intent to fire Mr. Merrill prior to the investigation being conducted. The existence of such evidence creates a material issue of fact as to whether Mr. Merrill was provided his right to due process in the termination of his employment.

1

A public employee has a property interest in continued employment and a Fourteenth Amendment right to due process if such a property right is deprived. *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Brewster v. Bd. of Educ. of Lynwood Unified School Dist.*, 149 F. 3d 971 (9th Cir. 1998). An essential component of due process is a "fair and impartial investigation." *Bradford v. Union Pacific R.R. Co.*, 872 F. Supp. 2d. 912 (2012). In this case, Mr. Merrill was wrongfully terminated because he was not provided proper notice of the allegations against him, was subject to inconsistent application and enforcement by LFA of the personnel policies cited as grounds for termination, and was not provided the opportunity to defend himself against allegations he violated personnel policies as well as state criminal statutes.

There are significant issues of fact that exist as to whether Mr. Merrill was afforded adequate due process during the investigation or at the pre-disciplinary hearing. Mr. Merrill was not provided with notice of the scope of the investigation, was not given an opportunity to respond to allegations and was terminated. The lack of due process afforded Mr. Merrill in the investigation of his alleged misconduct, the inconsistent application and enforcement of LFA personnel policies, and the expanded scope of the investigation conducted by Mr. Stoelk denied Mr. Merrill the opportunity to properly defend himself against allegations of misconduct reaching

back nearly ten years. Moreover, the primary allegations against Mr. Merrill that led Mr. Stoelk to conclude in his investigative report that violations of personnel policies and criminal acts had been committed were previously brought to the attention of LFA leadership several years prior and were dismissed as not warranting an investigation.

There is also a significant issue of fact regarding whether Chief Ney intended to terminate Mr. Merrill prior to the start of the investigation. Contrary to his deposition testimony, Chief Ney intended to terminate Mr. Merrill before the investigation began. There is evidence Chief Ney directed Mr. Stoelk to limit his investigation to certain individuals and discouraged Mr. Stoelk from interviewing personnel who worked with Mr. Merrill in his position at the current fire station. Additional communications Chief Ney had with other fire personnel prior to the investigation are also likely to provide evidence of his intent to fire Mr. Merrill before the investigation had begun. Such communications will also likely provide evidence that Mr. Stoelk was working in concert with LFA and Chief Ney to ensure the result of the investigation was Mr. Merrill's termination.

In addition, the investigative report drafted by Mr. Stoelk and the termination letter drafted by Chief Ney contain language improperly accusing Mr. Merrill of violating specific criminal statutes. These statements of fact were made by Mr. Stoelk

3

without a proper investigation of the allegations and were then relied upon by Chief Ney to effectuate the termination of Mr. Merrill. The allegations made by Mr. Stoelk and Chief Ney also led the Oregon Department of Public Safety Standards and Training office to conclude there was a "pending criminal investigation" into Mr. Merrill's conduct at work. DPSST subsequently revoked the fifteen fire fighter certifications held by Mr. Merrill prior to the investigation.

The use of such statements had foreseeable consequences which resulted in Mr. Merrill's termination from LFA and the revocation of his DPSST certifications. As a former DPSST certified police officer and current DPSST certified private investigator, Mr. Stoelk was well aware of the potential damage that could stem from his conclusion that Mr. Merrill committed specific criminal acts of harassment as defined in ORS 166.065 and theft as defined ORS 164.043.

As an experienced investigator of public employment matters, and being DPSST certified himself, Mr. Stoelk should have been very familiar with DPSST employment standards and could have easily foreseen the negative impact his findings of criminal acts would likely have on Mr. Merrill's employment status as well as his ability to maintain his DPSST certifications. Not only did Mr. Stoelk improperly accuse Mr. Merrill of criminal acts in his investigative report, but he worked with Chief Ney to deprive Mr. Merrill of his property interest in continued

4

employment.

For the reasons more thoroughly set forth below, the District Court's order granting Defendants' Motions for Summary Judgment should be reversed and Mr. Merrill's Motion to Compel discovery of those communications between Mr. Stoelk, Ms. Moffat, and Chief Ney showing an intent to fire Mr. Merrill prior to the investigation being concluded should be granted.

## JURISDICTIONAL STATEMENT

This case was first filed in the United States District Court for the District of Oregon, Eugene Division on June 18, 2020. 4-ER-735-744. This case is an appeal from the August 17, 2022 order in which the District Court adopted Magistrate Judge Kasubhai's Findings and Recommendation and granted Defendants' Motions for Summary Judgment 1-ER-6-30; 1-ER-3-4. The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331, Federal Question. This Court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291 because there are no other matters pending before the District Court upon entry of the District Court's judgment and order dated August 17, 2022. 1-ER-2-4. Mr. Merrill seeks review of the final order adopting Magistrate Judge Kasubhai's Findings and Recommendation and granting Defendants' Motions for Summary Judgment. 1-ER-3-4; 1-ER6-30.

Mr. Merrill timely filed a Notice of Appeal on September 16, 2022 pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A) and (B). 4-ER-745-747,

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in concluding Mr. Merrill's procedural due process rights were not violated because there were no issues of material fact and granting summary judgment in favor of Defendants on his claims of wrongful termination, deprivation of rights, defamation and negligence?

2. Whether the District Court erred in its related decision concluding Mr. Stoelk was a "representative of the lawyer," as defined in ORS 40.225(1)(f) and finding communications between Mr. Stoelk, Chief Ney, and Ms. Moffat were privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501 and therefore denying discovery?

STATEMENT OF THE CASE

Mr. Merrill was employed as an Engineer/Paramedic with Lane Fire Authority from 2007 through June 29, 2018. 4-ER-735. Around October 2017, Mr. Merrill was paired with Whitney Hutcheson-Warren ("Ms. Hutcheson-Warren") who served as a firefighter and paramedic for LFA. 3-ER-563.

On the morning of May 5, 2018, Ms. Hutcheson-Warren texted Mr. Merrill asking if she could list him as a reference for a job application. 2-ER-38. Mr. Merrill agreed to be a reference and was supportive of her applying to the position. 2-ER-38. The text message exchange between Ms. Hutcheson-Warren and Mr. Merrill that immediately followed her request is below:

> Mr. Merrill: "Of course and I think you should chica I am sure you would kick ass Let me know if you need anything from me k"
>
> Ms Hutcheson-Warren: "Thank you You're awesome"
>
> Mr. Merrill: "Lmao awe thanks but not really just am me lol Lol you funny"
>
> Ms. Hutcheson-Warren: "You are!"
>
> Mr. Merrill: "So are you whit"

After a brief moment, a final message from Mr. Merrill was delivered: "And stinking cute and sexy just saying sorry hope it's not to [sic] much or crossing a line" 2-ER-38-41; 2-ER-63-64.

8

Approximately eleven hours later, Ms. Hutcheson-Warren texted Mr. Merrill a response stating: "Hey Larry. I just wanted to say that I don't appreciate the way you were talking to me earlier. I have fun working with you and I don't want to feel uncomfortable at work. I don't want to see you get in trouble." 2-ER-39.

Mr. Merrill and Ms. Hutcheson-Warren were both in attendance at a training session the following morning. 3-ER-550. Mr. Merrill approached Ms. Hutcheson-Warren in person to say he was sorry for sending the text message and stated he had intended it for someone else. 2-ER-63; 3-ER-550. Mr. Merrill noticed that he had inadvertently sent text messages to several other people around the same time period the "cute and sexy" text message was sent to Ms. Hutcheson-Warren. 2-ER-36-37. Mr. Merrill informed Ms. Hutcheson-Warren that the text message was intended for his wife. 2-ER-63. After reporting the issue to his phone carrier, Mr. Merrill believed the issue with his phone was resolved. 2-ER-36-37.

That same morning, Mr. Merrill sent a number of texts to Ms. Hutcheson-Warren apologizing for the content of his previous text message: "Omg whit I am sorry I didn't mean to send that to you I am so so [sic] sorry I am freaking out please forgive me" and "I am literally like freaking out I am so so so [sic] sorry whit." 2-ER-40-41. Mr. Merrill followed those texts with, "I am so sorry I would understand if you went and said something to someone or went to the Chiefs I am

9

sorry whit I hope you can forgive me and it will never happen again I promise." 2-ER-40-41. Receiving no response from Ms. Hutcheson-Warren, Mr. Merrill sent a final text an hour and a half later: "So I am guessing your [sic] very angry and upset and going to say something which will lead to me getting terminated I am truly sorry Whitney." 2-ER-328.

At the training that morning, Ms. Hutcheson-Warren's immediate supervisor, Lieutenant Snauer ("Snauer") approached her and asked her how things were going. 3-ER-552. Ms. Hutcheson-Warren shared Mr. Merrill's text message with Snauer who then reported it to Chief Borland ("Chief Borland"). 3-ER-553. Although Snauer was left with the impression Chief Borland would investigate the incident, he later learned it was not going to be looked into. 3-ER-553.

Captain Colwell ("Colwell") who had heard about the complaint from Snauer, informed Snauer that he contacted Ms. Hutcheson-Warren on his own and learned Mr. Merrill had possibly engaged in additional misconduct towards Ms. Hutcheson-Warren. 3-ER-553. This caused both Snauer and Colwell to again contact Chief Borland and Chief Ney to encourage pursuing an investigation. 3-ER-553. Snauer also reported the incident to union steward Katie Johnson because he felt that telling her would help prompt management to do what was proper. 3-ER-554.

On May 15, 2018, Mr. Merrill received a letter notifying him that he was being

10

placed on non-disciplinary paid administrative leave "pending an investigation for sexual harassment in the workplace." 3-ER-336. The letter informed Mr. Merrill he was not to contact other district members, enter district properties, respond to district calls, or access district computers. 3-ER-336. The letter also stated, "No disciplinary action will be taken without notice and a pre-disciplinary meeting as per the collective bargaining agreement." 3-ER-336. The letter was signed by Chief Ney. 3-ER-336.

On May 16, 2018, Chief Ney contacted Mr. Stoelk about the situation involving Mr. Merrill. 3-ER-547. Mr. Stoelk arranged with Chief Ney to interview witnesses and conduct interviews. 3-ER-547. Mr. Stoelk and Chief Ney worked together to identify individuals to be interviewed in relation to the alleged sexual harassment claim against Mr. Merrill. 3-ER-547. Although Chief Ney denied participating in the investigation and claimed Mr. Stoelk was hired as an "outside investigator," an email exchange between Chief Ney and Mr. Stoelk beginning on May 16, 2018 through May 22, 2018 reveals significant input from Chief Ney in directing the outcome of the investigation. 3-ER-534; 3-ER-518-19; 2-ER-76-77. The email contains a list of potential interviewees who worked for LFA who had "routine contacts" or "infrequent contact" with Mr. Merrill as women Chief Ney believed "might have been recipients of attention." 2-ER-76-77. Chief Ney, however, denied

11

speaking with Mr. Stoelk regarding the investigation stating he did not want to be an "influence" on the investigation and just wanted to "let the investigation go where it went." 3-ER-518.

Mr. Stoelk began his investigation by interviewing Ms. Hutcheson-Warren, Snauer, and Colwell at the direction of Chief Ney. 3-ER-541, 547. Mr. Stoelk then interviewed eight additional individuals (Rodney Stewart ("Stewart") is listed as a witness in the report, but was the union steward who accompanied Mr. Merrill to the interviews and was not interviewed about the allegations independent from that role),several of whom were not affiliated with the fire station where Mr. Merrill was currently working. 3-ER-548. Mr. Stoelk suggested to Chief Ney and Ms. Moffat that other staff, particularly other female staff, who were affiliated with the fire station at which Mr. Merrill was currently working with Ms. Hutcheson-Warren should be interviewed. 3-ER-542-43.

Mr. Stoelk states in his investigative report that LFA contacted their legal counsel to arrange for an "independent investigation" of the allegations against Mr. Merrill, but later characterized his role as simply "assist[ing] in conducting" the investigation. 3-ER-547; 3-ER-540 Mr. Stoelk stated Chief Ney did not support interviewing additional staff at Mr. Merrill's station due to the cost and Chief Ney's general assumption that nothing would be gained by doing so. 3-ER-542-43. Mr.

12

Stoelk characterized Chief Ney as "a reluctant participant" at times during the course of the investigation. 3-ER-542. When asked, Chief Ney denied telling Mr. Stoelk to limit the investigation or save costs when it came to interviewing additional witnesses. 3-ER-518-19.

Mr. Stoelk began his investigation by interviewing the three "principal people"identified by Chief Ney. 3-ER-541. Mr. Stoelk interviewed Ms. Hutcheson-Warren for approximately 40 minutes, Snauer for 35 minutes, and Colwell for 25 minutes. 3-ER-547-554. Mr. Stoelk then interviewed Megan Jozwiak ("Jozwiak"), Christine Hollett ("Hollett") and Mary Sjogren ("Sjogren"). 3-ER-556-561. With the second round of interviews, the scope of Mr. Stoelk's investigation shifted from the alleged sexual harassment of Ms. Hutcheson-Warren via text by Mr. Merrill to alleged incidents that, in some cases, occurred nearly ten years prior. 3-ER-556-561. Based on the testimony provided by Jozwiak, Hollett, and Sjogren, Mr. Stoelk concluded that one of the more significant allegations in which multiple witnesses accused Mr. Merrill of stealing a female firefighter's underwear at a fire station could be attributed to Mr. Merrill's "fetish" and that his behavior in allegedly obtaining his fetish"material" was an act of criminal theft. 3-ER-581-82.

Although there are varying accounts as to when the alleged theft of underwear took place (based on Sjogren's statements the alleged incident occurred in 2009,based

on Jozwiak's and Hollett's statements the alleged incident occurred in 2012) 2-ER-67; 3-ER-559, 561. Mr. Merrill's testimony corroborates the 2012 time frame as he recalled the confrontation at the fire station with his then-wife Sjogren related to her discovery of another woman's underwear in his possession having occurred towards the end of their marriage while in the midst of a contentious divorce. 2-ER-196.

Both Jozwiak and Hollett reported the issue of the missing underwear to LFA on separate occasions not long after the alleged incident occurred. 3-ER-557, 559. Contrary to LFA workplace discrimination and harassment policies, however, it was never looked into. 3-ER-439-443; 3-ER-557, 559. Jozwiak drafted a written complaint and submitted it to then Fire Chief Heppel. 3-ER-557. Hollett drafted a report and submitted it to Colwell, Chief Hepple, and Chief Borland. 3-ER-559.

Upon review of the two separate written complaints, LFA management found the incident to be unworthy of an investigation. 3-ER-557, 559.

Mr. Stoelk not only included the women's statements as facts in his report, but also relied on them to conclude Mr. Merrill's alleged behavior constituted criminal acts, including harassment as defined in ORS 166.065, and theft as defined in ORS 164.015. 3-ER-584. There are significant questions of material fact regarding the alleged theft of underwear incident. These include a lack of physical evidence, a lack

14

of positive identification of the alleged stolen underwear, a complete disregard of a plausible alternative explanation provided by Mr. Merrill as to why he was in possession of underwear that did not belong to his then-wife, Sjogren, and an admission by LFA volunteer fire fighter Jennifer Wilson ("Wilson") to having a consensual sexual relationship with Mr. Merrill in 2012 in which she voluntarily left her underwear for Mr. Merrill under his pillow at the fire station. 3-ER-568.

As a result of Mr. Stoelk's investigation, Chief Ney drafted a pre-disciplinary letter that was provided to Mr. Merrill identifying June 29, 2018 as the date the pre-disciplinary hearing would be held along with a copy of Mr. Stoelk's report. 3-ER-337-38. In the pre-disciplinary letter, Chief Ney adopted Mr. Stoelk's findings that Mr. Merrill violated a number of LFA policies as well as state criminal statutes. 3-ER-337. Even though the timeline for disciplinary action had long passed under the collective bargaining agreement ("CBA") as it related to those allegations LFA had previously been notified of, and the statute of limitations had also passed to charge Mr. Merrill with the alleged crimes, both Mr. Stoelk and Chief Ney found the recounting of such events years after the fact by Jozwiak, Hollett, and Sjogren to be sufficient to allege such violations and criminal acts by Mr. Merrill. 3-ER-337, 447-48, 584.

Chief Ney presented Mr. Merrill with a prepared termination letter at the June

15

29, 2018 pre-disciplinary meeting and acknowledged he made the determination to terminate Mr. Merrill after reading Mr. Stoelk's report. 3-ER-428; 3-ER-520; 2-ER-55, 60. Chief Ney stated that in addition to the termination letter he drafted prior to the pre-disciplinary meeting and presented to Mr. Merrill at the pre-disciplinary meeting, he also brought "multiple disciplinary options drafted and in [his] briefcase" to the pre-disciplinary meeting. 2-ER-58.

After reading Mr. Stoelk's report, Chief Ney made the determination to terminate Mr. Merrill. 2-ER-55. Chief Ney based his decision to fire Mr. Merrill on an "ongoing pattern" of "sexually-related behavior and conduct in the workplace" that was allegedly uncovered by Mr. Stoelk's investigation. 2-ER-52. Some of the alleged incidents Chief Ney claimed created this pattern date as far back as 2007 (3-ER-561-62) and were either not reported at the time they occurred pursuant to LFA policy, or were reported, and it was determined they did not rise to the level of needing to be investigated contrary to LFA policy. 3-ER-557, 559; 3-ER-442-43. Chief Ney himself acknowledged the incident related to the inappropriate text message would likely be found to be a violation of LFA policy, but would probably not rise to the level of termination. 2-ER-52-53.

Mr. Merrill filed a Complaint in District Court on June 18, 2020 for wrongful termination, 42 U.S.C § 1983 deprivation of rights, defamation, and negligence

16

against LFA, Chief Ney, and Mr. Stoelk. 4-ER-735-744. Prior to the conclusion of discovery, LFA and Chief Ney filed their Motion for Summary Judgment on November 9, 2021. 4-ER-702. Mr. Stoelk filed his Motion for Summary Judgment prior to the conclusion of discovery as well on December 30, 2021. 2-ER-82.

On March 17, 2022, the District Court entered an order denying Mr. Merrill's Motion to Compel discovery of those communications likely to show an intent to terminate Mr. Merrill prior to the investigation being concluded. 1-ER-31.

On July 19, 2022, the District Court Magistrate Judge issued Findings and Recommendations to grant Defendants' Motions for Summary Judgment which was then referred to District Court Judge McShane. 1-ER-6-29. Mr. Merrill filed an objection to the Findings and Recommendations.

On August 17, 2022, the District Court issued an order and judgment in favor of Defendants adopting the Magistrate Judge's Findings and Recommendations in full and granting Defendants' Motions for Summary Judgment. 1-ER-2-4. This appeal followed.

The rulings presented for review are the District Court's Order granting LFA, Chief Ney, and Mr. Stoelk Summary Judgment and the District Court's order denying discovery of those communications between Mr. Stoelk, Ms. Moffat, and Chief Ney showing an intent to fire Mr. Merrill prior to the investigation being concluded.

17

## SUMMARY OF THE ARGUMENT

I.    The District Court erred in concluding Mr. Merrill's procedural due process rights were not violated because there were no issues of material fact by granting summary judgment in favor of Defendants on his claims of wrongful termination, deprivation of rights, defamation and negligence.

The District Court improperly granted summary judgment on Mr. Merrill's claims against LFA for wrongful termination and deprivation of rights because there is a dispute of material fact as to whether Mr. Merrill had notice of the allegations against him and the reasons for his termination. LFA violated Mr. Merrill's fundamental right to due process and the opportunity to be heard at a meaningful time and in a meaningful manner as required by law. *Mathews v. Eldridge*, 424 U.S. 319, 33 (1976). There is a question of fact as to whether notice of the allegations that resulted in Mr. Merrill's termination were properly provided to him.

There is a significant issue of material fact as to whether Chief Ney had already decided to terminate Mr. Merrill prior to the pre-disciplinary hearing. Chief Ney has offered varying accounts of when he made the decision to terminate Mr. Merrill and stated he prepared "multiple disciplinary options" which he brought with him to the pre-disciplinary hearing. The District Court accepted as undisputed fact that Chief

18

Ney prepared more than one termination letter, however, Chief Ney never produced copies of such options in discovery and Mr. Merrill strongly disputes they were ever prepared. This is a significant issue of material fact that should negate a ruling of summary judgment.

There is an issue of material fact as to whether the investigation into the allegations against Mr. Merrill was conducted in a fair and impartial manner. Mr. Merrill raised two significant issues of material fact that a jury could consider as to whether the investigation was impartial or unfair: 1) the fact that the investigation involved allegations from nearly ten years ago; and 2) the fact that the investigator accused Mr. Merrill of criminal acts based on those allegations. The fact that the allegations were so old contributes to a finding that the investigation was unfair because of the CBA's alone should negate summary judgment on the issue of due process.

There is an issue of material fact as to whether Mr. Merrill's defamation claim is time-barred. Mr. Merrill presented material facts to demonstrate that the defamatory statements contained in the termination letter were "published" to the DPSST at an unknown time and that Mr. Merrill was only made aware of the publication during the course of the DPSST hearing. The District Court found the letter was "published" because Mr. Merrill's union representative received a copy. Statements copied to the

19

union representative in the form of a termination letter are not "published." Mr. Merrill had no expectation that he could be harmed by his union representative reading the termination letter because the union representative was his advocate.

Mr. Merrill's claim for defamation is based on the allegation that he committed criminal sex abuse and theft. The District Court found that Chief Ney was immune from liability for publishing these defamatory statements because he was "discharging a duty under express authority" to "root out" sexual harassment in a public agency. Chief Ney's statements that Mr. Merrill committed criminal acts of sex abuse and theft were blatantly false and were not the result of his acting within a reasonable scope of his public duty.

Mr. Merrill clearly had insufficient notice of the allegations against him and was therefore denied due process during the investigation and in his efforts to defend himself at the pre-disciplinary hearing. The passage of time between the investigation and the alleged incidents, the inconsistent application and enforcement of LFA's own policies, the lack of sufficient notice, the unsubstantiated facts used to support Mr. Stoelk's findings, and the pre-determined decision to terminate Mr. Merrill before being provided an opportunity to be heard all create genuine issues of material fact for a jury.

II.     The District Court erred in its related decision concluding Mr. Stoelk

was a "representative of the lawyer," as defined in ORS 40.225(1)(f) and therefore finding communications between Mr. Stoelk, Chief Ney, and Ms. Moffat were privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501, and subsequently denying discovery.

Mr. Stoelk's communications with Chief Ney and Ms. Moffat are not privileged because he was not hired for the purpose, or in anticipation, of litigation. Mr. Stoelk was hired to investigate allegations of misconduct against Mr. Merrill and to determine if LFA policies had been violated. LFA and Chief Ney must show that Mr. Stoelk was a "representative of the lawyer" in his communications with LFA's attorney and with Chief Ney (or other LFA personnel). LFA and Chief Ney cannot show that Mr. Stoelk was a "representative of the lawyer" under these facts, and therefore his communications are not privileged.

Mr. Stoelk's investigation was never intended to be privileged. In fact, the facts show that the parties intentionally and deliberately chose to hire a neutral "outside" investigator to investigate the allegations against Mr. Merrill. There was no pending litigation at the time Mr. Stoelk was hired. Mr. Stoelk's report states that his investigation was requested because Mr. Merrill may have engaged in conduct contrary to employer policies related to professional conduct and harassment. The purpose of the investigation was to determine if Mr. Merrill had violated LFA

policies.

The investigation was not conducted in anticipation of litigation, nor was the investigative report drafted to be a privileged document. The investigation report was distributed to Mr. Merrill, Mr. Merrill's union representative, Chief Ney, Ms. Moffat, the DPSST, and the Unemployment Office. It follows that the communication between Mr. Stoelk and LFA, or LFA's counsel would not be privileged either. Nothing about Mr. Stoelk's investigation was intended to be protected by attorney client privilege under ORS 40.225. As such, all of his communication with LFA and LFA's attorney should be disclosed.

22

## STANDARD OF REVIEW

A district court's decision to grant summary judgment is reviewed de novo. *See Thrifty Oil Co. v. Bank of America Nat. Trust*, 322 F.3d 1039, 1046 (9th Cir. 2003); *Miller v. Comm'r*, 310 F.3d 640, 642 (9th Cir. 2002). The appellate court's review is governed by the same standard used by the trial court under Fed. R. Civ. P. 56(c). *See Suzuki Motor Corp. v. Consumers Union, Inc*., 330 F.3d 1110, 1131 (9th Cir. 2003). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Soc. Techs. LLC v. Apple Inc*., 4 F.4th 811, 816 (9th Cir. 2021); *Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017); *Olsen v. Idaho State Bd. of Medicine*, 363F. 3d 916, 922 (9th Cir. 2004).

Summary judgment may be affirmed on any ground supported by the record. *See Cruz v. Nat'l Steel & Shipbuilding Co*., 910 F.3d 1263, 1270 (9th Cir. 2018); *Campidoglio LLC v. Wells Fargo & Co*., 870 F.3d 963, 973 (9th Cir. 2017); *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009).

The district court's refusal to reconsider or to vacate summary judgment is reviewed for an abuse of discretion. *See F.T.C. v. Garvey*, 383 F.3d 891, 896 (9th Cir.2004); *Minnesota Life Ins. Co. v. Ensley*, 174 F.3d 977, 987 (9th Cir. 1999);

*School Dist. No. 1J, Multnomah County v. ACandS, Inc*., 5 F.3d 1255, 1263 (9th Cir. 1993).

The court of appeals reviews the district court's rulings concerning discovery for an abuse of discretion. *See IMDb.com Inc. v. Becerra*, 962 F.3d 111, 119 (9th Cir.2020); *Facebook, Inc. v. Power Ventures, Inc*., 844 F.3d 1058, 1070 (9th Cir. 2016); *Preminger v. Peake*, 552 F.3d 757, 768 n.10 (9th Cir. 2008); *Childress v. Darby Lumber, Inc*., 357 F.3d 1000, 1009 (9th Cir. 2004). "A district court is vested with broad discretion to permit or deny discovery, and a decision to deny discovery will not be disturbed except upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant." *Laub v. Untied States Dep't of Interior,* 342 F.3d 1080, 1084, 1093 (9th Cir. 2003)(internal quotation marks and citation omitted); *See also Kulas v. Flores*, 255 F.3d 780, 783 (9th Cir. 2011) (the district court's rulings concerning discovery will only be reversed if the ruling more likely than not affected the verdict).

"[The court] will only find that the district court abused its discretion if the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment." *Qualls v. Blue Cross, Inc*., 22 F.3d 839, 844 (9th Cir. 1994); *see also IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 127 (9th Cir. 2020).

24

Whether information sought by discovery is relevant may involve an interpretation of law that is reviewed de novo. *See Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622 (9th Cir. 1998). Issues regarding limitations imposed on discovery by application of the attorney-client privilege are governed by federal common law. *See Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9thCir. 1992). The district court's rulings on the scope of the attorney-client privilege are reviewed de novo. *See id.* at 130.

ARGUMENT

I.  The District Court erred in concluding Mr. Merrill's procedural due process rights were not violated because there were no issues of material fact by granting summary judgment in favor of Defendants on his claims of wrongful termination, deprivation of rights, defamation and negligence.

A plaintiff with a property interest in their employment cannot be deprived of that interest by the government without due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Mr. Merrill has a property interest in his employment with LFA. "[G]overnment employees can have a protected property interest in their continued employment if they have a legitimate claim to tenure or if the terms of the employment make it clear that the employee can be fired only for cause." *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 921 (9th Cir. 2013).

Mr. Merrill was not afforded legally adequate due process for a public employee in this case. The basic premise for due process is notice. Mr. Merrill was never provided with notice the investigation was expanded in scope to include remote and obscure allegations from as far back as 2007. LFA and Chief Ney terminated Mr. Merrill without his having an opportunity to fully respond to the allegations.

The District Court's decision to grant Defendants' Motions for Summary Judgment was not appropriate in this case. There are significant disputes of material facts as to whether: 1) Mr. Merrill was provided proper notice of the allegations

26

against him and the reasons for his termination; 2) Mr. Merrill was afforded a meaningful opportunity to be heard at his pre-disciplinary meeting; 3) the investigation itself was conducted in a fair and impartial manner; 4) Mr. Merrill's defamation claim is time-barred; and 5) Chief Ney is immune from liability for a defamation claim for falsely accusing Mr. Merrill of criminal acts.

A.  *Mr. Merrill was not provided proper notice of the allegations against him and the reasons for his termination.*

Summary Judgment is not appropriate on Mr. Merrill's claim against LFA for Wrongful Termination and Deprivation of Rights Claims. LFA violated Mr. Merrill's fundamental right to due process and the opportunity to be heard at a meaningful time and in a meaningful manner as required by law. *Mathews v. Eldridge*, 424 U.S. 319, 33(1976). There is no evidence that Mr. Merrill was provided proper notice of the allegations against him that resulted in his termination.

In *Pavel v. Univ. of Or.*, No. 6:16-cv-00819-AA, 2017 WL 1827706 (D. Or.,Eugene Div. April 3, 2017), a University of Oregon professor was fired under similar circumstances:

> [P]laintiff argues that without written explanation of the allegations against him, he did not have a meaningful opportunity to respond. Defendants respond they exhausted their due process requirements by providing a detailed oral summary of the evidence against plaintiff as well as a written summary of their findings. Walkup Decl. Ex. 1 at 5-14 Mar. 15, 2017; Blandy Decl. Ex. 3 at 1. While the Supreme Court recognized that generally a "tenured public employee

27

is entitled to oral or written notice of the charges against him [and] an explanation of the employer's evidence," Loudermill, 470 U.S. at 546, a summary of evidence may, "in certain circumstance, provide sufficient notice to allow a meaningful opportunity to respond[,]" ASSE Int'l, Inc., 803 F.3d at 1077. However, broad summaries of allegations do not always provide sufficiently meaningful opportunity to respond to the evidence, particularly where the government declines to provide "crucial details" and asserts that the allegations come from "confidential sources." Id. Evidence that is more detailed would provide plaintiff a greater opportunity to find inconsistencies and weaknesses in defendants' reasoning, decreasing the risk of erroneous deprivation. Moreover, it appears defendants could have provided access to the actual complaints without incurring any substantial burden. Plaintiff therefore raises a genuine dispute over material fact that defendants deprived him of a meaningful opportunity to respond to the charges and evidence against him.

The *Pavel* court held that plaintiff's procedural due process claim would survive summary judgment based on genuine issues of material fact concerning possible bias as well as "whether access to the written charges against him would have improved his ability to meaningfully respond to those charges." *Id.* at 9.

Further, LFA and Chief Ney did not follow the requirements outlined in the CBA. Mr. Merrill was a member of the firefighter's union. The rights and responsibilities of his employment were governed by the CBA. The allegations against Mr. Merrill dated as far back at times as almost ten years. Under the provisions of the CBA, those allegations related to the most significant violations outlined in Mr. Merrill's pre-disciplinary letter should not have been allowed as a basis for termination:

Section 13.4 states:

> Documentation of discipline shall be placed in the employee's personnel file. After the timeframes indicated below, the discipline cannot be relied upon as the basis for progressive disciplinary action should another incident occur warranting discipline. However, the authority reserves the right to the use of such documentation to refute a claim that the employee did not have knowledge of a policy, rule, or procedure.
>> Step 1- written record of oral reprimand – 1 year
>> Step 2- written reprimand- 2 years
>> Step 3- suspension or demotion- 4 years

Section 13.6 states:

> Any expired discipline will not be considered by promotion boards, referred to in written performance evaluations, nor relied upon as a basis for progressive discipline.

Section 13.8 states:

> No documentation regarding unfounded complaints shall be placed in an employee's personnel file, used in reviews for promotion, referred to in written performance evaluations, nor relied upon as a basis for discipline or future discipline. 3-ER-596-97

The CBA specifically states that even serious offenses requiring a suspension or demotion cannot be used more than four years after the fact to justify a more serious, escalated response to an incident, yet unsubstantiated incidents as far back as nine years make up a significant portion of the Stoelk investigation into Mr. Merrill. And allegations made by Jessica Topel ("Topel") of an alleged text message sent to her from Mr. Merrill containing an "unsolicited" image of Mr. Merrill's penis date as far back as 2007. 3-ER-561-62. Although Mr. Merrill stated Topel provided nude images to him as well (3-ER-566), the LFA, Chief Ney and the District Court determined

Topel was more credible than Mr. Merrill in her restatement of the facts without any supporting evidence.

There is a significant question of fact as to whether appropriate notice was provided to Mr. Merrill. The District Court findings state that the following language to Mr. Merrill in a letter provided "ample notice":

> "Effective immediately, you are on paid administrative leave until further notice. This leave is non-disciplinary in nature, and is pending an investigation for sexual harassment in the workplace." 3-ER-336.

However, Mr. Merrill was terminated for alleged violations of the following policies and criminal statutes: 1) LFA Policy 2.4 Discipline; 2) LFA Policy 2.1 Standards of Conduct; 3) LFA 2.2 Workplace Harassment/Sexual Harassment; LFA Policy 2.3 Violence Free Workplace; ORS 166.065 Harassment; and ORS 164.043 Theft in the third degree. 3-ER-337. Mr. Merrill was not provided notice that these allegations were charged or investigated until he received his pre-disciplinary letter.

Mr. Merrill was entitled to notice and an opportunity to respond to these allegations. *Clements v. Airport Auth. Of Washoe Cty.*, 69 F.3d 321, 323 (9th Cir.1995). There is no evidence Mr. Merrill received proper notice of these allegations during the investigation. Moreover, LFA and Mr. Stoelk have been elusive in their responses to Mr. Merrill's requests for production which include any

audio recordings of the investigation. It has been represented that these audio recordings have been destroyed even though Mr. Stoelk's report states all interviews were recorded and stored to a CD format. 3-ER-547. Mr. Merrill will testify that all of the allegations brought against him were not presented to him during the investigation and that he was not afforded an opportunity to respond to them. Without any physical evidence, it is Mr. Merrill's word against the Defendants. The District Court was not in a position to make a credibility determination at the summary judgment stage.

> B.    *There is no evidence that Chief Ney prepared "multiple disciplinary options" which he then allegedly brought with him to the pre-disciplinary hearing along with Mr. Merrill's termination letter.*

There is a significant issue of material fact as to whether Chief Ney had already decided to terminate Mr. Merrill before the pre-disciplinary meeting. Chief Ney has provided varying accounts as to how he came to the determination to terminate Mr. Merrill, the majority of which suggest he made the decision to terminate prior to the pre-disciplinary hearing. At Mr. Merrill's unemployment hearing Chief Ney stated he based his decision to fire Mr. Merrill on an "ongoing pattern" that had gone on for "a number of years." 2-ER-52. The pattern of behavior Chief Ney references is based upon the allegations found in Mr. Stoelk's investigative report. Chief Ney acknowledged the alleged text message Mr. Merrill sent to Ms. Hutcheson-Warren

would be a violation of LFA policy, but would likely not rise to the level of termination. 2-ER-52-53.

Chief Ney then testified at the DPSST hearing that he made the determination to terminate Mr. Merrill after reading Mr. Stoelk's investigative report. 2-ER-55.Chief Ney went on to state that he felt Mr. Merrill's behavior was not "compatible with [LFA's] policies," a determination he made prior to providing Mr. Merrill an opportunity to be heard in his own defense. 2-ER-55-56. In his deposition, Chief Ney claimed he decided to terminate Mr. Merrill after "seeing the results of the investigation and going through the hearing at the union office." 2-ER-58. This last effort by Chief Ney appears to attempt to address the fact that his previous statements about when he decided to terminate Mr. Merrill, if true, would have violated Mr. Merrill's procedural due process rights by denying him an opportunity to be heard.

In addition to Chief Ney's shifting narrative about when he decided to terminate Mr. Merrill, he also claimed to have brought "multiple disciplinary options" to the pre-disciplinary meeting in the form of written letters. 2-ER-58. Neither LFA nor Chief Ney have ever produced a copy of the alleged options he brought with him to the pre-disciplinary meeting, yet the District Court accepted as undisputed fact that Chief Ney prepared more than one letter. These are significant issues of material fact that should negate a ruling of summary judgment.

C.   *The investigation into Mr. Merrill was not conducted in a fair or impartial manner.*

There are significant issues of material fact that a jury could consider as to whether the investigation into Mr. Merrill was conducted in a fair and impartial manner. The investigation itself includes allegations of misconduct that occurred nine years ago, and in some cases eleven years ago. The fact that the investigator accused Mr. Merrill of criminal acts based on those allegations of nearly ten years ago are questions for a fact-finder in determining whether or not the investigation was fair and impartial. The fact that the allegations are so old contributes to a finding that the investigation was unfair because the CBA places its own limitation on both substantiated and unsubstantiated allegations of misconduct. In this case, the allegations are unsubstantiated without evidence to support the claims. That fact alone should negate summary judgment on the due process issue.

In addition, the investigation report includes a number of inflammatory statements that are not based in fact or on evidence. The inclusion of such statements and assumptions lead the reader to conclude Mr. Merrill has engaged in sexually harassing behavior in the workplace. Mr. Stoelk uses specific language in his report to guide the reader to a conclusion instead of simply reporting factual information. This includes portraying Ms. Hutcheson-Warren as a "petite, soft spoken and timid

sort of person" within the first few sentences. 3-ER-548. Mr. Stoelk spent a total of 40 minutes with Ms. Hutcheson-Warren in making this determination. Ms. Hutcheson-Warren is a volunteer fire fighter who is often faced with traumatic, sometimes life or death situations in which she is relied upon to make confident, life-saving decisions. Mr. Stoelk's depiction of Ms. Hutcheson-Warren creates an image of a victim before the interview has even begun.

Mr. Stoelk included additional statements from witnesses in his report that were not based on factual evidence, but were merely suspicions voiced by individuals who clearly disliked Mr. Merrill. Mr. Stoelk included a statement by Colwell that "staff feels as if Mr. Merrill is going to show up some day in a station parking lot and cause harm with his gun." 3-ER-555. Mr. Stoelk included no follow-up to that statement in which he asked what evidence there may be to suggest Mr. Merrill would do such a thing, or which specific staff members felt this way.

Mr. Stoelk also included statements from Hollett that had no factual basis. Hollett stated in her interview that she "always considered Mr. Merrill to be a creep and has often thought that if a female staff were to get raped at work, it would involve Mr. Merrill." 3-ER-559. Hollett's statement is pure conjecture and appears to be included for the purpose of depicting Mr. Merrill as a predator even though it contains no factual basis. Hollett also stated in her interview that Jozwiak had

34

reported to Hollett that Mr. Merrill was "aggressive" towards Jozwiak and was"coming onto her (Jozwiak)." 3-ER-559. Although Mr. Stoelk provided no follow-up to Hollett's allegations, this statement was later found to be untrue. Jozwiak herself testified in the DPSST hearing that Mr. Merrill had never said anything in her presence that was inappropriate and he had never come on to her or made advances toward her. 2-ER-68, In fact, Jozwiak testified that she had never seen Mr. Merrill talking inappropriately in a sexual manner to anyone at the fire station. 2-ER-68.

Mr. Stoelk also included his own statements in the report that appear to come from a biased opinion rather than a factual basis. Mr. Merrill admitted to Mr. Stoelk that he and his wife had an "open relationship." 3-ER-563. Mr. Stoelk responded by asking if Mr. Merrill and his wife were "swingers." 3-ER-563. Mr. Stoelk also confronted Mr. Merrill about his response of "not recalling" many of the events of the past saying it had an appearance of "copping out" on his part. 3-ER-567.However, when Mr. Stoelk asked Wilson if Mr. Merrill had ever sent her an image of him wearing her panties with his penis exposed, as reported by Topel, he accepted Wilson's response that "she honestly could not recall" whether it had happened or not. 3-ER-568. Even though "[i]t is not quite as mundane as a discussion of having forgotten to buy bread at the store," Mr. Stoelk does not conclude that Wilson's inability to recall such an event "simply lacks any credibility" as he concluded with

Mr. Merrill's inability to recall specific events from years past. 3-ER-579.

In his conclusion, not only does Mr. Stoelk accuse Mr. Merrill of violating LFA policies and state criminal statutes, but he also finds that Mr. Merrill's alleged conduct is evidence of "grooming behaviors." 3-ER-581. Mr. Stoelk accuses Mr. Merrill of "trolling" behavior that is supported by "the list of current and past staff dating back at least for the past eight years." 3-ER-581. Mr. Stoelk goes on to find that Mr. Merrill committed a criminal act by engaging in his "fetish" for women's underwear by "enter[ing] the presumed private sleeping quarters of a female staff and rifled her dirty laundry to steal dirty underwear." 3-ER-581-82. Mr. Stoelk's report makes no mention by Jozwiak that the underwear was stolen from her room, but instead states they were "missing from the clothes hamper," or the "communal washer." 3-ER-557. The conclusion Mr. Stoelk comes to that Mr. Merrill committed the criminal act of theft when he allegedly stole Jozwiak's underwear is based upon a tenuous (at best) connection that Jozwiak's missing underwear and the underwear in Mr. Merrill's possession are both a brand of underwear that is sold at Fred Meyer. 3-ER-557, 560. Not that the underwear in question is actually a "Fred Meyer" brand of underwear, but that it is a brand of underwear for sale at Fred Meyer. This is the only evidence offered in Mr. Stoelk's report of a positive identification of the alleged stolen underwear. This, along with the fact that Mr. Merrill admitted to his then-wife,

36

Sjogren, that the underwear in his locker did belong to Jozwiak, not as statement of fact, but to prevent her from storming into the fire station, confronting his co-workers, and demanding to know who they belonged to all create issues of material fact for a jury.

These examples of the biased and inflammatory language contained in Mr. Stoelk's report create significant issues of material fact that a jury could consider as to whether the investigation into Mr. Merrill was conducted in a fair and impartial manner.

      *D.*    *An issue of material fact exists as to whether Mr. Merrill's defamation claim is time-barred.*

Mr. Merrill's defamation claim is not time barred. A defamation claim accrues when the plaintiff is made aware of the publication of defamatory statements. *Kobold v. Good Samaritan Regional Medical Center*, 832 F.3d 1024, 1048 (2016). Mr. Merrill was made aware that defamatory statements were published to DPSST on August 12, 2019. Publication means when someone's reputation is injured by the known false statements. *Id.*

Mr. Merrill presented material facts to the District Court to demonstrate that the defamatory statements contained in Mr. Merrill's termination letter were "published" to the DPSST at an unknown time, and that Mr. Merrill only knew about

that publication at the DPSST hearing. Mr. Merrill had no other way of knowing that the termination letter had been published.

In March 2019, Mr. Merrill received notification from DPSST that his certifications were going to be revoked based on sexual harassment and criminal investigations. Mr. Merrill requested a hearing to contest the decision. At the DPSST hearing on August 12-13, 2019, Mr. Merrill learned that the "sexual harassment" and "criminal investigation" allegations were taken from the termination letter drafted by Chief Ney based on Mr. Stoelk's findings. 3-ER-536-37. Mr. Merrill's DPSST certifications were subsequently revoked on October 30,2019. 3-ER-593-95.

The District Court found that the letter was "published" when Mr. Merrill's union representative received a copy. However, the union representative was copied as Mr. Merrill's personal representative, similar to an attorney or other agent of Mr. Merrill's. Mr. Merrill's union representative had a contractual obligation to Mr. Merrill to advocate for him. He was not an impartial third party and was not someone from which Mr. Merrill could experience reputational injury in this context. Therefore, statements copied to the union representative are not "published" for the purpose of a defamation claim. Mr. Merrill would have no expectation that he could be harmed by the union representative reading the letter, as the union representative was his advocate. The question of when the defamatory statements were effectively

"published" creates a material fact for a jury.

> E.  *Chief Ney is not immune from liability for a defamation claim when he has falsely accused Mr. Merrill of criminal acts.*

Chief Ney does not enjoy qualified immunity because Mr. Merrill is asserting that he was deprived of constitutional due process. The requirements for proper notice and due process afforded Mr. Merrill were clearly established by the CBA which was not followed.

The statements made by Chief Ney were knowingly false. Mr. Merrill was not found by any member of law enforcement to have violated ORS 166.065 and ORS 164.043. The manner in which the allegations were presented in the termination letter drafted by Chief Ney led DPSST to conclude there was a "pending criminal investigation." 3-ER-536. Chief Ney did nothing to clarify or correct this interpretation of the allegations against Mr. Merrill.

Mr. Merrill's claim for defamation is based on the allegations that he committed criminal sex abuse and theft. The District Court found that Chief Ney was immune from liability for publishing these defamatory statements because he was "discharging a duty under express authority" to "root out" sexual harassment in a public agency. Chief Ney's statements that Mr. Merrill committed criminal acts of sex abuse and theft were blatantly false and were not the result of his acting within a

reasonable scope of his public duty. The question of whether Chief Ney falsely accused Mr. Merrill is an issue of material fact for a jury.

II. The District Court erred in its related decision concluding Mr. Stoelk was a "representative of the lawyer," as defined in ORS 40.225(1)(f) and therefore finding communications between Mr.Stoelk, Chief Ney, and Ms. Moffat were privileged pursuant to ORS 40.225 and Federal Rule of Evidence 501, and subsequently denying discovery.

The federal law of privilege applies in claims arising under a federal question. Federal Rule of Evidence 501. "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Smith v. Coulombe*, 2013 WL428363 at *3 (United States District Court, D. Oregon, Pendleton Division, 2013)(citing *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005) (citations omitted). Although federal law controls, state law may still be considered when state actors are involved. *Id*. at *3. *See, e.g. Doubleday v. Ruh*, 149 F.R.D. 601, 605 n.3 (E.D.Cal. 1993) (However, the fact that federal law controls does not make a discussion of state law entirely irrelevant where state actors are involved..."); *Kelly v. City of San Jose*, 114 F.R.D. 653, 656 (N.D.Cal. 1987) ("None of this means, however, that federal courts should wholly ignore state laws, or rights recognized by state governments, when analyzing privilege issues in civil rights cases."))

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United*

*States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citation omitted). The party asserting privilege has the burden of establishing the applicable privilege. *Id*. The attorney-client privilege exists where: "(1) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *Id*. (citation omitted)

However, "because it impedes full and free disclosure of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (quotations and citation omitted). It is vital to the privilege "that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. Gurtner*, 474 F.2d 297, 298 (9th Cir.1973)(emphasis in original)(quotations and citation omitted).

The work-product doctrine "is not a privilege but a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. Untied States District Court for the District of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989)(citing Fed. R. Civ. P. 26(b)(3)). Documents or the compilation of materials prepared by agents of the attorney in preparation for litigation may be covered by the work-product

41

doctrine. *Richey*, 632 F.3d at 567. To qualify for work-product protection, materials must: "(1) be prepared in anticipation of litigation or for trial and (2) be prepared by or for another party or by or for that other party's representative." *Id.*(quotations and citation omitted).

The work-product doctrine affords special protections for materials that reveal an attorney's mental impressions and opinions ("opinion" or "core" work product). *Admiral Ins. Co.*, 881 F.2d at 1494; Fed. R. Civ. P. 26(b)(3)(B). Other materials, however, may be ordered produced upon a showing of substantial need for the information and that it cannot be otherwise obtained without undue hardship. *Id.*; Fed. R. Civ. P. 26(b)(3)(A)(ii). To obtain "opinion" work product, a party must show that the mental impressions of counsel are at issue and the need for the material is compelling. *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F2d 573,577 (9th Cir. 1992). The primary purpose of the work-product doctrine is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co.*, 881F.2d at 1494). Work-product protection, however, like the attorney-client privilege, is waivable. *Richey*, 632 F.3d at 567).

Here LFA and Chief Ney must show that Mr. Stoelk was a "representative of the lawyer" in his communications with LFA's attorney and with Chief Ney (or other LFA personnel). LFA and Chief Ney cannot show that Mr. Stoelk was a

42

"representative of the lawyer" under these facts, and therefore Mr. Stoelk's communications are not privileged.

Mr. Stoelk's investigation was never intended to be privileged. In fact, the facts show that the parties intentionally and deliberately chose to hire a neutral "outside" investigator to investigate Mr. Merrill's conduct. "Under the federal rules, a qualified privilege protects the work product prepared by or for another party or by or for that party's representative, such as an attorney, investigator, or agent, which was created *in anticipation for litigation*. (Emphasis added). *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011); *Amy's Kitchen, Inc. v. Stukel Mountain Organics LLC*, 2016 WL 9406695 at \*2 (United States District Court, D. Oregon, Medford Division 2016).

The rule protects only those things which are prepared in "anticipation of litigation" and not those prepared in the regular course of business. *Brink et ux v. Multnomah County*, 224 Or. 507, 517, 356 P.2d 536 (1960). Investigation reports prepared by or for an insurer may fall into either category depending on the purpose of the investigation disclosed by the evidence. *United Pacific Ins. Co. v. Trachsel*, 83 Or.App. 401, 404 (Ct. App. Or. 1987).

Here, there was no pending litigation at the time that Mr. Stoelk was hired. While opposing counsel might argue that he was hired and asked to investigate just in case of litigation, Mr. Stoelk's report states that his investigation was requested

because Plaintiff may have engaged in conduct contrary to employer rules related to professional conduct and harassment. The purpose of the investigation was to determine if Mr. Merrill had violated LFA policies.

Clearly, Mr. Stoelk's investigation report has been relevant for this current litigation, but that does not mean it was prepared in anticipation of litigation. In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used. *Amy's Kitchen, Inc. v. Stukel Mountain Organics LLC*, 2016 WL 9406695 at *2 (United States District Court, D. Oregon, Medford Division 2016). Dual purpose documents are deemed prepared in anticipation of litigation if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *Id*. In applying the "because of" standard, courts must consider the totality of the circumstances and determine whether the " 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.' " *Id*. at 908 (quoting *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998)). *Id*. Thus, a document created in the normal course of a party's business operations but also relevant to an anticipated lawsuit might be subject to discovery. *See*, e.g., *Amy's Kitchen v. Stukel Mountain Organics LLC*, Case No.

44

1:16-cv-00071-CL, 2016 WL 9406695, at *3 (D. Or. Sept. 28, 2016)("Even if a document is prepared partially for litigation and partially in the normal course of business-i.e., for a "dual purpose"-the Court must consider the totality of the circumstances to determine whether or not it would have been created in a substantially similar form but for the prospect of litigation.").

In this case, the investigation report was distributed to Mr. Merrill, Mr. Merrill's union representative, Chief Ney, LFA's attorney, the DPSST, and the Unemployment Office. The report itself is certainly not privileged. It follows that the communication between Mr. Stoelk and LFA or LFA's counsel would not be privileged either. If Mr. Stoelk was truly a "representative of the lawyer" his report would be treated as an internal memorandum from a lawyer would be treated. It would be labeled as confidential and treated as such. Nothing about Mr. Stoelk's investigation was intended to be protected by attorney client privilege under ORS 40.225. As such, all of his communications with LFA and LFA's attorney should be disclosed.

LFA and Chief Ney, through their continuous, voluntary testimony and evidence put on at administrative hearings, have waived any privileged communications that they had with Mr. Stoelk. LFA and Chief Ney have the burden to show that certain communication or documents are privileged and that they did not

waive the privilege. *Weil v. Inv./Indicators, Research & Management, Inc*., 647F.2d 18, 25 (9th Cir 1981); *State v. Moore*, 45 Or.App. 837, 609 P.2d 866 (1980). Voluntary relinquishment of certain evidence by the defendant waives the privilege. *Goldsborough*, 105 Or. App. at 504, citing, *In re Grand Jury Investigation of Ocean Transp*., 604 F.2d 672 (D.C.Cir.), cert. den. 444 U.S. 915, 100 S.Ct. 229, 62L.Ed.2d 169 (1979); *Liggett v. Brown & Williamson Tobacco Corp*., 116 F.R.D.205, 207 (M.D.N.C.1986); *O'Leary v. Purcell Co.*, 108 F.R.D. 641, 646(M.D.N.C.1985); *Underwater Storage, Inc. v. United States Rubber Co.*, 314F.Supp. 546 (D.D.C.1970); McCormick, Evidence § 93, 194 n 14 (E. Cleary 2d ed1972). Such relinquishment need not be express, but can also be by implication. *Id*. LFA, Chief Ney, and Mr. Stoelk have expressly and impliedly volunteered the contents and nature of communications between Mr. Stoelk and LFA, Chief Ney, and Ms. Moffat time and again at administrative proceedings. Most significant was Ms. Moffat's questioning of Mr. Stoelk at the Unemployment Hearing. She specifically asked him about his communications with Chief Ney. This is clear evidence that Mr. Stoelk was not a "representative of the lawyer," but it is also a waiver if any such privilege existed.

Defendants have continuously used this evidence of their communications among these parties to their advantage at the various administrative proceedings. It

is likely they intend to do the same at trial. Defendants cannot have it both ways.

There is a significant issue of fact regarding whether Chief Ney intended to terminate Mr. Merrill prior to the start of the investigation. Contrary to his deposition testimony, Chief Ney intended to terminate Mr. Merrill before the investigation began. There is evidence Chief Ney directed Mr. Stoelk to limit his investigation to certain individuals and discouraged Mr. Stoelk from interviewing personnel who worked with Mr. Merrill in his position at the current fire station. Additional communications Chief Ney had with other fire personnel prior to the investigation are also likely to provide evidence of his intent to fire Mr. Merrill before the investigation had begun. Such communications will also likely provide evidence that Mr. Stoelk was working in concert with LFA and Chief Ney to ensure the result of the investigation was Mr. Merrill's termination.

Although a district court is vested with broad discretion to permit or deny discovery, allowing the discovery of the communications between Mr. Stoelk, Chief Ney, and Ms. Moffat would have precluded the granting of summary judgment in this case. The denial of discovery in this case resulted in actual and substantial prejudice to Mr. Merrill as allowing it would likely have precluded summary judgment on his claims for wrongful termination without adequate due process, negligence, and 42 U.S.C § 1983 deprivation of rights.

CONCLUSION

The District Court abused its discretion in denying Mr. Merrill's Motion to Compel discovery which resulted in actual and substantial prejudice as allowing the discovery would have precluded summary judgment. The District Court abused its discretion in granting Defendants' Motions for Summary Judgment even though Mr. Merrill provided substantial evidence that significant issues of material fact exist in this case. This court should reverse the District Court's grant of summary judgment in favor of Defendants and remand with an order to compel discovery of those communications relevant to Mr. Merrill's claims.

DATED:  February 28, 2023

ERIN E. GOULD, LLC

/s/Erin E. Gould
Erin E. Gould, OSB 103935
erin@eringouldlaw.com

Attorney for Appellant
Larry W. Merrill

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 22-35731

I am the attorney or self-represented party.

**This brief contains** 10,656 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [ ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Erin E. Gould **Date** 2/28/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

CERTIFICATE OF SERVICE

 I certify that on February 28, 2023, I served or caused to be served a true copy of APPELLANT'S OPENING BRIEF to the party or attorney for each party as follows:

Ms. Janet M Schroer
Hart Wagner LLP
1000 SW Broadway Ste 2000
Portland OR  97205
Email:  jms@hartwagner.com
  Attorneys for Defendants Ney and Lane Fire Authority

Mr. Jeffrey Hansen
Chock Barhoum
121 SW Morrison Street Suite 415
PORTLAND OR 97204
jeff.hansen@chockbarhoum.com
  Attorney for Defendants Stoelk Investigation and D. Craig Stoelk

✓ by electronic service via the Federal Court's CM/ECF system.

    ERIN E. GOULD, LLC


    /s/Erin E. Gould
    Erin E. Gould,  OSB 103935
    Attorney for Appellant Merrill

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Description | Page |
|---|---|
| U.S. Const. amend. XIV, § 1 | 1 |
| 42 U.S.C. § 1983 | 2 |
| Fed. R. Evid. 501 | 3 |
| Fed. R. Civ. P. 26(b)(3) | 4 |
| Fed. R. Civ. P. 56(c) | 5-6 |
| ORS 40.225 | 7-9 |
| Lane Fire Authority Personnel Manual (excerpts) | 10-22 |
| Collective Bargaining Agreement (excerpts) | 23-24 |

**U.S. Const. amend. XIV, § 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

1

**42 U.S.C. § 1983**

§ 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
(R.S. §1979; Pub. L. 96–170, §1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104–317, title III, §309(c), Oct. 19, 1996, 110 Stat. 3853.)

CODIFICATION
R.S. §1979 derived from act Apr. 20, 1871, ch. 22, §1, 17 Stat. 13. Section was formerly classified to section 43 of Title 8, Aliens and Nationality.

AMENDMENTS
1996—Pub. L. 104–317 inserted before period at end of first sentence '', except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable''. 1979—Pub. L. 96–170 inserted ''or the District of Columbia'' after ''Territory'', and provisions relating to Acts of Congress applicable solely to the District of Columbia.

EFFECTIVE DATE OF 1979 AMENDMENT
Amendment by Pub. L. 96–170 applicable with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after Dec. 29, 1979, see section 3 of Pub. L. 96–170, set out as a note under section 1343 of Title 28, Judiciary and Judicial Procedure.

**Fed. R. Evid. 501**

The common law — as interpreted by United States courts in the light of reason and experience — governs a claim of privilege unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute; or
- rules prescribed by the Supreme Court.

But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

**RULE 26 OF THE FEDERAL RULES OF CIVIL PROCEDURE: GENERAL PROVISIONS REGARDING DISCOVERY; DUTY OF DISCLOSURE**

(3) Pretrial Disclosures.

In addition to the disclosures required by Rule 26(a)(1) and (2) , a party must provide to other parties and promptly file with the court the following information regarding the evidence that it may present at trial other than solely for impeachment:

(A) the name and, if not previously provided, the address and telephone number of each witness, separately identifying those whom the party expects to present and those whom the party may call if the need arises;

(B) the designation of those witnesses whose testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony; and

(C) an appropriate identification of each document or other exhibit, including summaries of other evidence, separately identifying those which the party expects to offer and those which the party may offer if the need arises.

Unless otherwise directed by the court, these disclosures must be made at least 30 days before trial. Within 14 days thereafter, unless a different time is specified by the court, a party may serve and promptly file a list disclosing (i) any objections to the use under Rule 32(a) of a deposition designated by another party under Rule 26(a)(3)(B), and (ii) any objection, together with the grounds therefor, that may be made to the admissibility of materials identified under Rule 26(a)(3)(C). Objections not so disclosed, other than objections under Rules 402 and 403 of the Federal Rules of Evidence, are waived unless excused by the court for good cause.

4

**Fed. R. Civ. P. 56 Summary Judgment**

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is

5

competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(f) When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(g) Affidavits Made in Bad Faith. Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Mar. 2, 1987, eff. Aug. 1, 1987.)

**ORS 40.225**

40.225 Rule 503. Lawyer-client privilege. (1) As used in this section, unless the context requires otherwise:

(a) "Client" means:

(A) A person, public officer, corporation, association or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from the lawyer.

(B) A person, public officer, corporation, association or other organization or entity, either public or private, who consults a lawyer referral service with a view to obtaining professional legal services from a lawyer.

(b) "Confidential communication" means a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

(c) "Lawyer" means a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.

(d) "Lawyer referral service" means an entity that, as a regular part of its business, refers potential clients to lawyers, including but not limited to a public nonprofit entity sponsored or operated by the Oregon State Bar.

(e) "Representative of the client" means:

(A) A principal, an officer or a director of the client; or

(B) A person who has authority to obtain professional legal services, or to act on legal advice rendered, on behalf of the client, or a person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the person's scope of employment for the client.

7

(f) "Representative of the lawyer" means one employed to assist the lawyer in the rendition of professional legal services, but does not include a physician making a physical or mental examination under ORCP 44.

(2) A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

(a) Between the client or the client's representative and the client's lawyer or a representative of the lawyer;

(b) Between the client's lawyer and the lawyer's representative or the client's lawyer referral service;

(c) By the client or the client's lawyer to a lawyer representing another in a matter of common interest;

(d) Between representatives of the client or between the client and a representative of the client;

(e) Between lawyers representing the client; or

(f) Between the client or a representative of the client and a lawyer referral service.

(3) The privilege created by this section may be claimed by the client, a guardian or conservator of the client, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or lawyer referral service or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client.

(4) There is no privilege under this section:

(a) If the services of the lawyer or lawyer referral service were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;

8

(b) As to a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction;

(c) As to a communication relevant to an issue of breach of duty by the lawyer or lawyer referral service to the client or by the client to the lawyer or lawyer referral service;

(d) As to a communication relevant to an issue concerning an attested document to which the lawyer or lawyer referral service is an attesting witness; or

(e) As to a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients.

(5) Notwithstanding ORS 40.280, a privilege is maintained under this section for a communication made to the office of public defense services established under ORS 151.216 for the purpose of seeking preauthorization for or payment of nonroutine fees or expenses under ORS 135.055.

(6) Notwithstanding subsection (4)(c) of this section and ORS 40.280, a privilege is maintained under this section for a communication that is made to the office of public defense services established under ORS 151.216 for the purpose of making, or providing information regarding, a complaint against a lawyer providing public defense services.

(7) Notwithstanding ORS 40.280, a privilege is maintained under this section for a communication ordered to be disclosed under ORS 192.311 to 192.478. [1981 c.892 §32; 1987 c.680 §1; 2005 c.356 §1; 2005 c.358 §1; 2007 c.513 §3; 2009 c.516 §1; 2018 c.2 §1]

**Lane Fire Authority Personnel Manual**

**RIGHTS AND DUTIES OF THE ADMINISTRATION**

Agency Administration has the right duty and responsibility to manage the affairs of the agency, without limitation. By illustration, the exclusive rights, functions, and prerogatives of the Agency Administration will include the following:

1. To determine the specific programs and services offered by the District, as well as the methods, means, and facilities by which they will be effectuated.

2. To determine the qualifications of the work force, to introduce and assign the duties and equipment, to direct and evaluate employees in the performance of their work assignments, and to determine schedules of work and time off.

3. To hire, promote, train, retain, lay off, suspend, and to discipline, demote, and discharge employees for just cause, and to discharge probationary employees at will.

4. To implement new, and to revise or discard whether in whole or in part, existing procedures, materials, equipment, facilities, and standards.

5. To eliminate, reorganize, or combine the work.

6. To make changes in established policies, procedures, rules or regulations to carry out the mission of the District.

**PROBATIONARY PERIOD**

Initial Probation. Every new member will serve a one (1) year probationary period. Upon completion of the probationary period, the member will become a regular employee. Probationary employees are subject to termination at the discretion of the District. Promotion Probation. Every promoted member will serve a probationary period of six (6) months. During this period, if the promoted member fails to meet the required work standard, or if the promoted member so chooses, they will return to their previously held position and wage rate. No promoted member will be terminated from employment without just cause.

**DISCIPLINE AND DISCHARGE**

No member will be disciplined or discharged except for just cause. Discipline will

10

normally be progressive and corrective, unless the severity or repetitiveness of the misconduct involved warrants more severe action. Disciplinary action will include, but not be limited to, the following:

1. Written reprimand
2. Suspension with pay
3. Suspension without pay
4. Pay reduction
5. Discharge

If the Chief has reason to discipline or counsel a member, the Chief will strive to impose such discipline in a manner that will not embarrass the member in front of other members, or the public.

In the event the District believes a member may be subject to discipline greater than suspension with pay, the following procedural due process will be followed:

1. The member will be notified in writing of the charges or allegations that may subject them to discipline.

2. The member will be notified in writing of the disciplinary sanction being considered.

3. The member will be given an opportunity to refute the charges or allegations either in writing or orally in an informal hearing with the Chief to be held not less than ten 10 days from the date the notice is received.

4. The Chief will consider the employee's presentation and will act on the charges or allegations in writing within 14 calendar days.

## PERSONNEL RECORDS

There will be only one official personnel file for each member and that file will be maintained at the administrative office. The file's contents and access to them will be in conformance with applicable statutes. A member may inspect the contents of his/her official personnel file in the presence of the Chief or designee at any reasonable time.

If the member believes that any of the above material is incorrect or a misrepresentation of facts, they will be entitled to in writing his/her explanation or opinion regarding the prepared material. This will be included as part of his/her personnel record until the material is removed.

A member may include in their personnel file, and/or training file, as appropriate, copies of any relevant documents, such as letters of favorable comment, licenses, certificates, college course credits or any other documents which reflects creditably on the member.

Written reprimands and any lesser form of discipline will be removed from the personnel file after one (1) year, provided there are no recurrent problems of a similar nature.

**HOURS OF WORK**

The work week will begin on Sunday and end on Saturday. The normal work schedule for full-time employees will consist of up to 56 hours in a 7 day work week. Full-time employees will work a variety of shifts. Examples are 40 hours a week, plus on call. 24 hours on, 48 hours off. 48 hours on, 96 hours off. Workdays for part-time and temporary are variable.

Work Schedules. Work schedules will be kept as regular and as predictable as possible. Due to the nature of the mission, and the size of the work force, flexibility may be required of all members. Examples of special circumstances

1. Agency emergency
2. Personal emergency
3. As necessary to allow members to attend special work related meetings, training or programs, where their presence is required.

In cases of a bona fide emergency, the agency will provide as much notice as practical. The same is expected from members.

**OVERTIME**

For economy and controllability of cost, overtime will be kept to a minimum. Overtime will be paid in accordance with State and Federal law.

On-Call Duty. Employees will not be required to make themselves available for on-call duty. If a member is assigned by the District to serve on-call duty, they will be compensated for the hour actual worked at the straight time or overtime rate, as appropriate. Employees who are called back to work while serving on-call duty will be compensated hour for hour at the appropriate rate of pay for all time worked.

## WAGES

Wages will be paid in accordance with the pay scale or service contract for a particular position. For employees covered by a 'step scale'. Step increases will occur annually on the employee's anniversary date in their position, based on satisfactory performance. Other employees will be compensated based on the rate set by the Board of Directors.

Upon promotion to a position with a higher salary range, employees will be placed at the step which is nearest to and higher than their current salary, whichever is greater. The effective date of the promotion will become the employee's new anniversary date.

All employees will be paid bi-weekly on Monday for all hours worked which consists of twenty six (26) pay periods per year. Pay will be by direct deposit or check. All hours worked need to be into the Administrative Aide by noon of the prior Thursday to be reflected on the Monday pay day. Extra hours worked and reported after this deadline will appear on the next pay period. The District realizes through out the year that some holidays fall on the Monday for pay day and will make every effort to communicate those conditions and pay the preceding Friday.

## HOLIDAYS
The following days will be recognized and observed as paid holidays:
January 1, New Year's Day
Martin Luther King Jr. Day
Memorial Day
July 4th, Independence Day
Labor Day
Veterans' Day
Thanksgiving Day
Friday following Thanksgiving

13

December 25th, Christmas Day
One Floating Holiday

The floating holiday will be scheduled at the employee's discretion, subject to the operating requirements of the agency.

Holiday Pay. All employees eligible for holiday pay will be given credit for a normal eight (8) hour workday worked at regular salary rates on these holidays. Weekend Holidays. Whenever a holiday falls on a Sunday, the succeeding Monday will be observed as the holiday. Whenever a holiday falls on a Saturday, the preceding Friday will be observed as the holiday.

Holiday During Leave. Should a member be on authorized sick leave or vacation when a holiday occurs, the holiday will not be charged against such leave or vacation.

Holiday Work. Any member who is scheduled to work on a designated holiday will have the holiday hours added to their vacation time.

**SICK LEAVE**
Accumulation. Sick leave will accrue sick leave at the rate of one (1) day for each full month of service. A day consists of the number of hours for which the member is regularly scheduled to work. Sick leave may be accumulated to a maximum of 800 hours.

Sick leave is earned beginning on the date of hire.

Utilization. All employees are eligible to receive sick leave pay for the following reasons:

1. Personal illness, injury, or physical disability
2. Illness, injury, or physical disability in the family for up to five working days per occurrence.
3. Doctor o r dental appointments.
Should the member become eligible to use sick leave while on vacation, they may terminate their vacation time and go on sick leave upon notice to the Chief.

A member who returns following a layoff or a leave without pay will have previously

14

accrued sick leave credits reinstated. Sick leave will not accrue during any period of layoff or leave of absence.

Integration with Workers' Compensation. When a member is injured on the job, they may utilize accrued sick leave to supplement payments received under Workers' Compensation up to the amount of net salary. In such instances, prorated charges will be made against the employee's accrued sick leave.

**OTHER LEAVES**
Parental Leave. Parental leave will be granted as provided by law.
Military Leave. Military leave will be granted as provided by law.
Compassionate Leave. In the event of a death in the immediate family (spouse, parents, stepparents, children, stepchildren, siblings, in-laws, grandparents and grandchildren), the Chief will grant sufficient time off to employees with pay to make funeral arrangements, if necessary, and to attend the funeral. Such leave will not be charged to sick leave accumulation.

Witness/Jury Duty Leave. A member called for jury duty or subpoenaed as a witness under circumstances beyond their control and where such duties can be construed to be in the public interest will be paid their regular salary during the time spent for such services, less remuneration received for jury service or witness fee. Employees maybe required to spend as much time as they can on their regular duties when not occupied on jury duty or as a witness.

Medical Leave. A member will be eligible for a medical leave of absence after their accumulated sick leave has been used up. The length of the leave will be determined by the employee's doctor, except that in no case will such leave be granted for more than six 6 months. Medical leave will be considered a temporary leave of absence and will be without pay or benefits. On return, the member will be placed in their previous position.

**VACATIONS**
Eligibility. Employees will be eligible for paid vacation from the date of initial hire.
Accrual Rates. Employees will earn vacation time with pay on a bi-weekly basis at the following rates:

Section 3. Maximum Accrual. Employees may not accrue more than two (2) times

15

their annual accrual rate, as specified in Section 2, plus 80 hours. Employees near maximum accrual will be given every opportunity to take time off or be paid at their hourly rate for time over the cap.

Vacations will be granted at the time requested by the employee, subject to reasonable operational requirements. If the agency is compelled by operational requirements to reduce the number of vacations allowed at the same time, the member with the greatest seniority right will be given preference of choice for vacation periods. Any member who leaves the agency or dies while still a member, prior to using their vacation, will be paid for all earned but unused vacation they had accumulated at the time of separation.

## HEALTH AND WELFARE

For employees covered by District provided medical insurance, the District will continue to provide medical, dental, and vision insurance coverage for employees and their dependents that is equivalent to that presently in effect, unless another plan is mutually agreed upon. Medical insurance costs are very high. The District will pay premiums for such coverage for covered members as described in the bargaining unit agreement with IAFF Local 851.

The District will provide life and accidental death and dismemberment coverage for all members. The District will pay the full premium for such coverage.

## EDUCATION/TRAINING

The District will continue to pay for all certifications and licenses required for District employment, as well as the training and preparation costs approved by the Chief and/or Training Officer.

The District will continue to send employees to conferences, seminars, classes and other similar educational functions that are intended to upgrade the individual's job-related skills and abilities, at the District's discretion. Such opportunities will be distributed as equally as possible. The District will pay for all tuition, fees, books, and materials needed to complete such training. Attendance at such conferences and classes is at the discretion of the District. The District, at its discretion will pay tuition and basic costs for extra classes attended by/and on an employees own, off duty time.

## SAFETY & HEALTH

The District will provide adequate and safe tools for all employees. Any tools which the member provides for their own use in performing their job duties will be safe and appropriate for the specific job being performed. Any safety clothing and equipment required to be worn or used by the employees will be furnished and maintained by the District.

No member will be expected to operate any equipment or to perform a work assignment that is unsafe, as provided in the statutes. Federal and State safety and health regulations will be observed by the District, and all employees. Employees will use all required protective equipment, will perform their work in a safe manner, and will comply with all safety rules of the District. Employees will promptly report all unsafe equipment to the Division Chief of Support and Logistics, in person, by phone or email and preferably on the appropriate service form.

## CLOTHING/UNIFORMS
The District will supply uniformed employees with appropriate uniforms, consistent with current issue.

## GENERAL PROVISIONS
Position Descriptions. Individual position descriptions will be reduced to writing and delineate the duties currently assigned to an employee's position.

## WORKPLACE DISCRIMINATION AND HARASSMENT
## 2.2.0 POLICY STATEMENT
Lane Fire Authority is committed to maintaining an environment free of unlawful discrimination and harassment for both members and non-members of the Authority. Unlawful discrimination or harassment based on a person's protected class will not be tolerated nor condoned. Reported cases of unlawful discrimination or harassment will be investigated immediately and offenders will be subject to immediate discipline as set forth in this policy.

## 2.2.1 RESPONSIBILITY / AUTHORITY
Every Authority member is responsible for preventing, not participating in, and reporting cases of unlawful workplace harassment to his or her supervisor. Supervisors are responsible for preventing workplace harassment at the work group and department level, and shall contact the Chief or Company Officer when

17

allegations arise. In the case where an individual is uncomfortable with reporting harassment to their Supervisor, he/she may contact the next level of supervision and/or the President of the Board of Directors, following the chain of command. An investigation shall immediately be undertaken under the direction of the Fire Chief and/or the Board of Directors, followed by appropriate action as described within this policy. At no time shall the intent of this policy be used to circumvent the chain of command for normal operations or procedures. Should the employee feel that any Fire Authority contact would put him or her in a compromising position, he or she should seek consultation from the Authority Employee Assistance Program by calling 1-800-535-1347, or visiting http://www.cascadehealth.org/direction

## 2.2.2 DEFINITIONS

A. **"Authority Member":** Authority members include all individuals affiliated with the Authority, including employees, volunteers, members of the Board of Directors, and all other recognized representatives of the Authority.

B. **"Protected Class":** The term "protected class" refers to characteristics of individuals that are protected by state or federal law and/or Authority policy. Discrimination becomes unlawful when it is based on an individual's status in one or more of the following areas unless otherwise justified by business necessity or a bona fide occupational qualification (BFOQ): race, color, national origin, sex, sexual orientation, religion, disability, age, marital status, pregnancy or other classification as determined by federal and state regulations.

C. **"Bona Fide Occupational Qualification" (BFOQ):** Applied to the Authority, this is a job qualification that is reasonably necessary in order to meet normal work requirements.

D. **"Unlawful Discrimination":** Discrimination in any employment practice (e.g., hiring, firing, promotion, pay, etc.) that is based upon a person's protected class is unlawful and will not be tolerated.

E. **"Unlawful Harassment":** Harassment is a form of discrimination, and becomes unlawful when it is based on one or more of an individual's protected class(es). Unlawful harassment will not be tolerated.

18

F. **"Sexual Harassment":** Harassment that is directed towards an individual because of his/her gender or that is sexual in nature may be considered sexual harassment. This type of harassment generally takes the form of unwelcome verbal or physical conduct of a sexual nature, unwelcome sexual advances, or requests for sexual favors. When an individual is required to submit to this behavior as a part of their job, or when their job (or some aspect of it) becomes contingent on their acceptance or rejection of the behavior, such behavior becomes unlawful. Furthermore, related behavior that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, and/or offensive work environment may also be construed as sexual harassment. Sexual harassment in any form will not be tolerated.

G. **"*Quid Pro Quo* Harassment":** "*Quid pro quo*" is an exchange of something for something. When applied to sexual harassment, *quid pro quo* harassment takes place when an individual:

**1.** who has (or appears to have) the ability to affect the terms or conditions of another's employment**,**

**2.** seeks or obtains sexual favors which are made a condition of employment or
**3.** influences employment decisions which may affect tangible aspects of that person's employment.

H. **"Hostile Environment Harassment":** This form of harassment involves behavior that:

**1.** is motivated by the target's protected class that makes the workplace offensive, hostile, or intimidating;
**2.** unreasonably interferes with an individual's work performance, and
**3.** alters the conditions of an individual's employment.

**2.2.3 DESCRIPTION**
**Harassment becomes** unlawful when it is based upon one or more of an individual's protected class(es). The most common type is "hostile environment" where a work environment is created that becomes intimidating, hostile or offensive due to behavior that is based on one or more protected class(es). Such behavior may include physical conduct or gestures, speech, visual displays, audio presentations or other materials or behavior that is based on one or more protected class(es) and goes beyond accepted

19

workplace behavior. Although the law may not consider isolated instances as creating a hostile environment, the Authority may do so for purposes of investigation and discipline. In general, sexual harassment may result from the following:

**A**. **Unwanted sexual advances:** Examples include, but are not limited to, unwanted touching, sexual flirtations, unwanted advances, propositions of a sexual nature, or any similar behavior.

**B. Requests for sexual favors:** Inappropriate requests include, but are not limited to, actual or implied propositions of a sexual nature or requests for sexual favor(s).

**C. Conduct or speech that is of a sexual nature or based upon gender:**
Behavior of a sexual nature or that is gender-based that goes beyond acceptable workplace behavior includes, but is not limited to, sexually oriented comments, gestures, or similar behavior or speech of a sexual nature; comments regarding an individual's appearance that are of a sexual nature; sexually-oriented jokes; or use of sexually degrading words.

**D. Sexually-oriented behavior that unreasonably interferes with work performance:** This includes, but is not limited to, unwanted sexual attention such as ogling, leering, verbal abuse of a sexual nature, and/or sexual flirtations where such attention reduces job performance.

**E. Creating a hostile work environment:** A "hostile environment", or a work environment that is hostile, intimidating, or otherwise offensive, may develop from unwelcome, sexually-oriented behavior. This behavior may include, but is not limited to, unwelcome sexual advances or physical contact; sexual innuendoes, suggestions, requests, or other sexually-oriented statements of an offensive nature; or visual display of pictures, posters or other visible materials of a sexual nature; or persistent telling of off color jokes.

## 2.2.4 COMPLAINT PROCEDURE
All Authority members are required to immediately report any perceived harassment, whether directed towards himself or herself, another Authority member, or towards a non-member by an Authority member, while on District property or while representing the Authority.

Reports will be considered and investigated in a timely manner as outlined within this policy. All reports should be filed directly with the member's immediate supervisor who will then oversee the investigation process. However, if the individual feels uncomfortable with reporting the incident to their supervisor, he or she may confide in the next level of supervision, the Fire Chief, the Board President, or another responsible Authority member who will than act upon the report. An appropriate person appointed by the President of the Board, and/or Fire Chief would then oversee investigations.

It is recommended that complaints be filed in writing for documentation purposes; however, each reported case, whether verbal or in writing, will be considered serious and investigated thoroughly. Failure by an Authority member to report cases of harassment could imply a welcome relationship or environment and will not be condoned. Confidentiality will be maintained at all times insofar as possible. Each case will be quickly and confidentially investigated to determine whether harassment has occurred.

### 2.2.5 INVESTIGATION

An investigation will be completed any time an allegation of harassment occurs. The Fire Chief, or a representative appointed by the Board of Directors, shall undertake such investigation with the goal of its completion within thirty (30) days of the date the complaint was filed. In the event the investigation finds allegations to be substantiated, corrective action will be immediately ordered and communicated to the individual filing the complaint. All investigations will be designed to protect the privacy of, and minimize suspicion toward, all parties involved.

Allegations that are substantiated will result in immediate disciplinary action against the Authority member engaged in the harassment as defined in this policy. Likewise, maliciously fraudulent accusations may result in equally severe disciplinary action. Where harassment is found to be directed towards an Authority member by a non-member, the Authority will take immediate action to remedy the situation.

In any case where facts cannot be substantiated nor allegations proven, the behavior of all parties involved, including the overall behavior of all personnel at the worksite of the affected parties, will be monitored for a period of time. If similar reports of behavior are submitted, the investigation process will re-open. If no further incidents of behavior are observed or reported during the period of review, the matter will be

considered closed.

In any case where the alleged victim and/or alleged offender(s) in the investigation process are dissatisfied with the investigation or disciplinary procedures used in this process, they may appeal directly to the Fire Chief and/or President of the Board of Directors. Appeals should be received by the office of the Fire Chief or Board President within ten (10) days of the closing of the investigation or the implementation of any discipline, which ever is longer.

## 2.2.6 NON-RETALIATION POLICY

The Authority will not tolerate retaliation for any reason. Neither supervisors nor Authority members are to retaliate against a member in any way for filing charges or reporting harassment. No member should worry about retaliation resulting from the filing of such a charge. Any Authority member found to retaliate against another Authority member, whether a supervisor or not, will be immediately disciplined up to and including termination.

## 2.2.7 DISCIPLINARY ACTION

If a claim of harassment is substantiated, disciplinary action will follow as outlined in the Organizational Manual, P-2.4. If allegations of harassment are found to be maliciously fraudulent, the same disciplinary procedures will be taken against the member raising false accusations.

**Collective Bargaining Agreement Between Lane Fire Authority and International Association of Fire Fighters, Local 851**

ARTICLE 13: DISCIPLINE & DISCHARGE

13.1 No employee who has completed the initial employment probationary period with the Authority shall be subject to discipline or discharge without just cause. Unless otherwise warranted by circumstances, discipline normally shall be progressive, including oral reprimand, written reprimand, suspension, demotion, and discharge.

13.2 If the Authority determines there is just cause for reprimand, demotion, suspension, or discharge, the Authority shall provide the employee, with a copy to the Union, with written notice of the proposed disciplinary action, the grounds for such action, and the right of the employee to respond either orally or in writing to the person initiating such action prior to implementing the proposed action. Such written notice shall be provided to the employee at least fifteen (15) calendar days prior to the proposed effective date of the action.

13.3 Upon request of the employee, the Authority shall allow the employee an opportunity to consult with a Union representative prior to the interview and to have a Union representative present during interviews or other disciplinary meetings with management representatives. The role of the Union representative at this meeting shall be as defined by the Employment Relations Board. However, this opportunity for representation shall not unduly delay such interviews or meetings. This section shall not apply to any interview or meeting with an employee in the normal course of business, counseling, instruction, or other routine contact with a supervisor where discipline is not contemplated.

13.4 Documentation of discipline shall be placed in the employee's personnel file. After the timeframes indicated below, the discipline cannot be relied upon as the basis for progressive disciplinary action should another incident occur warranting discipline. However, the Authority reserves the right to the use of such documentation to refute a claim regarding the employee's overall employment record or to refute a claim that the employee did not have knowledge of a policy, rule, or procedure:

Step 1 - written record of oral reprimand 1 year

23

Step 2 - written reprimand 2 years
Step 3 - suspension or demotion 4 years

13.5 If subsequent conduct occurs that leads to discipline of a written reprimand or greater during this period of time, all current disciplinary action may continue to be relied on.

13.6 Any expired discipline will not be considered by promotion boards, referred to in written performance evaluations, nor relied upon as a basis for progressive discipline.

13.7 No information that reflects critically upon an employee shall be placed in a personnel file without the review and the signature of the employee. The employee's signature confirms only discussion and presentation of the document to the employee, and does not indicate agreement or disagreement. The employee or the Union (with the employee's signature) has the right to attach a statement of rebuttal to any information placed in the personnel file.

13.8 No documentation regarding unfounded complaints shall be placed in an employee's personnel file, used in reviews for promotion, referred to in written performance evaluations, nor relied upon as a basis for discipline or future discipline.

24